Case No. 17-1130 et al. M.D. Miller Trucking & Topsoil, any Petitioner v. National Labor Relations Board. Mr. Leib for the Petitioner, Ms. Rajapaksi for the Responder. Good morning, May it please the Court. My name is Michael Leid. I represent M.D. Miller Trucking & Topsoil Company. Good morning. As far back as 1941, the U.S. Supreme Court noted that the concept of mitigation of damages in National Labor Relations Board cases involves a healthy policy of promoting production and employment. Indeed, one of the cases cited by counsel for the General Counsel here is a Ninth Circuit case, the Kawasaki Motors Manufacturing Corporation case, which points out that discriminatee must show a sincere inclination to work and be self-supporting consistent, again, with a healthy policy of promoting production and employment. Our position in this case is the evidence didn't support the Administrative Law Judge's finding that Mr. McCallum actually made a sincere and diligent effort to try to find alternative employment. As the Court knows, we've got basically four seeming job applications in a more than two-year period. He testified to potentially 20 contacts and then said he applied for 80 or 90 other jobs that he had no record of, whatever. Are you saying that we have to overturn the credibility findings of the Administrative Law Judge? Yes, Judge, that's what I'm saying. And I realize that's a high burden for me to persuade this Court, but I would point out that even the National Labor Relations Board occasionally, not in this case, but occasionally overturns credibility findings as well. And I think when you look at all the evidence in the case, that's not a very big leap. I was starting to say that he was admonished by at least two entities, the Union and the National Labor Relations Board Compliance Officer and the Illinois Unemployment Commission to keep a record of his job search. As the Court knows, he talked to his union representative apparently on almost a weekly basis. We don't have testimony that he was told to keep a record of a job search, but the minimal amount of effort it would have taken to jot down a note that, on September 5th, I applied on Craigslist to the following job, I think is very telling. His testimony is that he, every couple of weeks, did Internet searches. So if we don't set aside the credibility finding, do you lose? Is that enough? I still don't think that's enough, Judge. I don't think if you count the number of days where over 700 days in the back pay period, even if we believe he made 80 to 90 job applications during that period, I still don't think that shows a diligent job search. If I was trying to get work, I'd try a little harder than that if I was out of work. But that's not the standard, sir. The standard doesn't require him to be successful. It doesn't even really say diligent. It says good faith, right? Well, I think that there is certainly an element of diligence encompassed here. If indeed the public policy that has been enunciated by the Supreme Court is to promote employment, the man had an obligation to work reasonably hard to try to find a job. Your Honor, speaking to his union representative every week or two weeks, you don't think that that's, are you saying that we shouldn't credit that testimony? Well, Your Honor, I'm not necessarily saying that. In fact, I think that that sort of helps if the court recalls the testimony of Mr. Elsberry. Primarily these conversations were about am I going to get back to M.D. Miller as a result of this grievance settlement? That's certainly a reasonable question to ask in the first month after the grievance award, second month, third month. At some point, I would think that the conversation would be turning to, hey look, you're my union, I'm paying dues, are there jobs that you can get me to? That's not what the ALJ found. The ALJ found that he spoke to him repeatedly about referrals. And then if you look at the testimony of Mr. Elsberry, he testified that he was reluctant to refer him for jobs because he didn't want him to be referred and then quit the job because he would go back to M.D. Miller. So that's not, you can't blame Mr. McCallum for that, right? I also listed numerous job openings for truck drivers or helpers during the period of time. I think that there's a limited weight that should have been given to that testimony. I don't certainly suggest that there was never any discussion of trying to find work, but with testimony from third party uninterested witnesses about the number of job openings that there were, I just find it difficult to believe that Mr. Elsberry at some point didn't say, you know, we've got, ultimately he found a pipeline job for him, transporting men around the job site. But if indeed there were nearly a thousand jobs in trucking filled during this back pay period as found by the Administrative Law Judge, there clearly was work. And the witnesses that we put on at the back pay hearing were all signatories to Local 179. So it's my opinion and our position that there was not a diligent job search. The other thing, and this has been thoroughly briefed and I don't want to waste the Court's time, I would like to point out that part of the reason for the Administrative Law Judge's finding was that Mr. McCallum in fact collected unemployment. In Illinois you can collect unemployment for 26 weeks in the usual case. So assuming he got it in 2013, 2014, or part of 2015, that only accounts for half the year. And even then, the board law that talks about receipt of unemployment benefits being prima facie evidence of the job search is simply what it says. It's prima facie, but it's not an unrebuttable presumption. And I think that the judge should have taken into account that fact and I think this Court can as well. And the other thing, as the Court knows from our briefs, is the effort that Mr. McCallum had to put forth to collect those unemployment benefits was minimal. He phoned an automated telephone number twice a week and I'm not sure exactly what he did, pushed a button or something like that to say he was available for work. But being available for work, I suggest, is different than actively looking for work. I'm trying to understand this argument. Are you saying that the Administrative Law Judge put more weight on that than he was legally permitted to? Well, almost, Judge. I guess what I'm saying is in relying on the receipt of unemployment benefits as prima facie evidence of the job search, that under the Illinois regime, it really isn't. It's not much other than making a phone call every two weeks, which is about what the job search was like. Making a computer search or application every so often, if we credit everything Mr. McCallum said. I don't really have anything else to say to the Court. No one's ever accused me of talking too short a time. If there are any other questions, I'd be happy to address them. Otherwise, I'd be happy to yield to my colleague. All right. We can reserve your time for rebuttal. Thank you. Good morning, Your Honor. May it please the Court? My name is Melekshmi Rajapaksa. I'm Counsel for the National Labor Relations Board. I do appreciate what my colleague just said about the Supreme Court's decision in Phillips-Dodge. But I would say in general, the company's presentation loses sight of or ignores several basic principles. As the victim of an unfair labor practice that resulted in loss of employment, Mr. McCallum is presumptively entitled to some back pay. So the company's position that it owes nothing in this case is really quite startling. The company has the burden to rebut the presumption that some back pay is owed. And where it's asserting a job search defense, as in this case, its specific burden is to show that the discriminatee did not make an honest, good-faith effort to find interim employment during the back pay period. And I have to disagree with my colleague that there is not substantial evidence in this case to support the finding that the company did not meet its burden. Mr. McCallum credibly testified that he searched for work on a biweekly basis, looking at multiple sources, walking into establishments on his own where there were no ads, looking online. And he also had at least some documentation. He's looking, sort of, he testifies he's looking every other week on Internet sites or driving around at particular sites. But there are two things he didn't do. One was look at the website or list maintained by the state of Illinois as part of its unemployment, its help for people who are unemployed who are getting unemployment compensation. And the other is, while he's clearly engaged with the union in some respects, my understanding is he doesn't really seek help from their out-of-work referral list. And your response to that, quite rightly, is to say, as a general matter, the worker doesn't have to do everything, everything possible. But those seem like they would be pretty obvious alternatives for someone going to the state and going to his union for their lists of jobs. Right. The board and the case law does not require the discriminantee to use any particular methods. What the board does is it looks at what the employee did do and considers whether that reflects an honest, good-faith effort. So an exhaustive search, yes, would have included the various other outlets that you're talking about. But he didn't have to use any particular avenue in order to preserve his right to back pay. Am I wrong that those would be particularly obvious and particularly promising? Going to the list of jobs maintained by his union for people who need that kind of work seems like a more promising avenue than going on monster.com or whatever. Well, correctly or incorrectly, Mr. McCallum reasonably believed that by keeping in touch with the union representative that he knew, he was relaying his interest in work on an ongoing basis, and he did communicate with him regularly. That testimony is corroborated by the union. So help me out just what he did or didn't do with the union. Because he is engaged with the union, but on this work referral list, your response in your brief is not that he did that, it's that he didn't have to do that. So what is he doing with the union and what is he not doing with the union? Well, he didn't go through the formalities of getting on the list, and there appears to have been some sort of misunderstanding on his side as to what he needed to do, because his testimony is he believed that he had done enough by simply talking to the union representative. And in fact, in 2015, he got a job from the union, proving that what he did was enough in terms of the union, because it was always understood by Mr. Elsberry that Mr. McCallum wanted work and was looking for work. It was actually Mr. Elsberry's choice to withhold certain opportunities from Mr. McCallum because he thought he would get employment with the company after winning a grievance, after winning a board case, and so on. I will also mention in terms of the Illinois state resources through the unemployment office, there's a, I believe it's the Second Circuit case that's cited in our brief, Atlantic Veal, in which the employee did not avail himself of that unemployment agency's services, and yet he still was found to have done enough. Does the record have any evidence one way or the other about how comprehensive that Illinois database is? It doesn't, because I don't think Mr. Leeds' evidence about the resources of the unemployment office, the listing of jobs, I don't think that that actually was admitted into the record, but I may be mistaken about that. In any event, as the board's brief points out, the Illinois unemployment benefits law requires an active search for work, and that is extremely clear from the literature that the unemployment agency provides and puts online, and that is all cited in the brief. I will say in terms of the telephone system that Mr. Leeds refers to, it may seem like a minor effort to press buttons on a phone, but the pressing of buttons reflect answers to certification questions, and so the employee is asked to certify not only availability for work, but also the fact that they have done an active job search in the prior two weeks before the certification, and the state punishes instances of fraud. So this is not a minor or negligible effort that Mr. McCallum put forward, and the receipt of unemployment benefits does support the board's finding that Mr. McCallum made an honest, good-faith effort to actively search for work during the fact pay period. I will also say that Mr. Leeds just told the court that his client does not believe, and he does not believe that Mr. McCallum made a reasonably diligent search for work. I will just remind the court that the standard is whether the fact finder found Mr. McCallum believable, and he did. The fact finder credited Mr. McCallum with an honest, good-faith effort over the course of the entire back pay period. He based that decision in part on corroborating documentary evidence, testimony from the union representative, and Mr. McCallum's specific recollection of over 20 job contacts. So I would submit to this court that the evidence is substantial to support the board's decision. The company has not shown that the credibility determinations are patently insupportable, which is the standard in this court, and therefore we do ask for enforcement of the board's compliance decision, the award of back pay. In addition, and this is not an issue that the company is contesting, the board is also entitled to enforcement of its prior order having to do with the remedy for the unfair labor practices, and because it's an uncontested order, the board is entitled to some reinforcement. Thank you. Thank you. Any rebuttal? Mr. Lee. Very briefly, Your Honor. Maybe we're making too much of this an employment issue, but the fact of the matter is that Mr. McCallum would only have to justify or explain his job search if he was asked. I think the evidence shows in this case that certainly he never testified that anyone asked, and I suppose if he had been asked, his evidence of what he actually did would have been just as sketchy as it was with the labor board. As to the standard, again, I've already recognized that in asking this court to overturn a credibility finding, I'm fighting an uphill battle, but I do think that the court has to look at all the evidence, including the evidence that detracts from the evidence in his favor. And then finally, I didn't really tell the court what relief I wanted. We would ask the court to refuse to enforce the ALJ and NLRB's decision, and with that regard, it's not only the net back pay but the various fund contributions and interest that were ordered as well. Thank you. Thank you. We'll take the case under advisement.
judges: Wilkins, Katsas, Randolph